UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Robert Curry<br>725 Rhoads Avenue<br>Jenkintown, PA 19046<br><br>        Plaintiff,<br><br>   v.<br><br>United Parcel Service, Inc.<br>d/b/a United Parcel Service of PA, Inc.<br>d/b/a UPS<br>55 Glenlake Parkway<br>Atlanta, GA 30328<br><br>   And<br><br>United Parcel Service of PA, Inc.<br>d/b/a United Parcel Service, Inc.<br>d/b/a UPS<br>123 S. Broad Street<br>Philadelphia, PA 19109<br><br>   And<br><br>International Brotherhood of Teamsters<br>d/b/a Teamsters Local 623<br>d/b/a Teamsters Holding Company, LLC<br>25 Louisiana Avenue, N.W.<br>Washington, D.C. 20001<br><br>   And<br><br>Teamsters Local 623<br>d/b/a Teamsters Holding Company, LLC<br>4369 Richmond Street<br>Philadelphia, Pa 19137<br><br>   And<br><br>Teamsters Holding Company, LLC<br>1310 Lackawanna Trail<br>Clarks Summit, PA 18411 | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:  NO.:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:  **JURY TRIAL OF TELVE (12) DEMANDED**<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

| | |
|---|---|
| And | : |
| | : |
| John Does 1-10 | : |
| | : |
| Defendants. | : |

## CIVIL ACTION COMPLAINT

### I. JURISDICTION AND VENUE

1. Jurisdiction in this Honorable Court is based on federal question conferred by 28 U.S.C. §1331 and 42 U.S.C. §1983, et seq; supplemental jurisdiction over state law claims is granted by 28 U.S.C. §1367.

2. Venue lies in this district in that the events giving rise to this claim occurred here, at least one Defendant resides, maintains a principal place of business, and/or does business here, and/or the property which is the subject of this action is situated within this district.

### II. PARTIES

3. Plaintiff, Robert Curry, is an adult individual residing at the above-captioned address.

4. Defendant, United Parcel Service, Inc., doing business as United Parcel Service of Pennsylvania, Inc., further doing business as UPS ("UPS"), is a corporation duly organized and existing under and by virtue the laws of the State of Ohio, with an office at the above-captioned address.

5. Defendant, United Parcel Service of Pennsylvania, Inc., doing business as UPS ("UPS"), is a corporation duly organized and existing under and by virtue the laws of the Commonwealth of Pennsylvania, with an office at the above-captioned address.

6. Defendant, International Brotherhood of Teamsters, doing business as Teamsters Local 623, further doing business as Teamsters Holding Company, LLC ("Teamsters"), is a charitable

organization duly organized and existing under and by the virtue of the laws of the District of Columbia, with an office at the above-captioned address.

7. Defendant, Teamsters Local 623, doing business as Teamsters Holding Company, LLC, is an organization duly organized and existing under and by the virtue of the laws of the Commonwealth of Pennsylvania, with an office at the above-captioned address.

8. Defendant, Teamsters Holding Company, LLC, is a limited liability company duly organized and existing under and by the virtue of the laws of the Commonwealth of Pennsylvania, with an office at the above-captioned address.

9. Defendants, John Does 1-10, is a moniker/fictitious name for individuals and entities currently unknown but will be substituted when known, as affiliated, associated or liable hereunder for the reasons set forth below or inferred therefrom. Each of these parties are incorporated as Defendants in each and every count and averment listed above and below. Upon information and belief, Defendants, John Does, were agents, servants, workmen, or employees of Co-Defendants, liable to Plaintiff hereunder.

### III. OPERATIVE FACTS

10. On or around July 29, 1996, Plaintiff was hired by Defendant, UPS, and joined the local union, Defendant, Teamsters Local 623. Plaintiff worked part-time until approximately 2002, when Plaintiff became a package driver.

11. Plaintiff worked at UPS without incident and with positive reviews until in or about 2013.

12. In or around Winter 2013, UPS's union contract with the Teamsters was approaching expiration. Under negotiation was a divisive change in health care benefits, from an excellent

Blue Cross / Blue Shield health insurance plan to a Teamster-managed TeamCare health insurance plan.

13. Both national and local Teamsters leadership were providing little to no information to their members on the coverage or other details of the proposed Teamster-managed TeamCare health insurance plan.

14. Plaintiff decided to have a t-shirt made, stating "Vote No" in reference to the membership vote on accepting the new contract with UPS, which included the Teamster-managed TeamCare health insurance plan. The t-shirt was designed on UPS-brown t-shirts with the appropriate-matching yellow wording, stating "Vote NO". Plaintiff began wearing his "Vote No" t-shirt.

15. The popularity of the t-shirt climbed rapidly. Plaintiff sold the t-shirt to hundreds of co-workers at Teamsters Local 623. In time, Plaintiff joined a Facebook Page, entitled "Vote No on UPS Contract," through which Plaintiff supplied t-shirts to local Teamster unions all over the country.

16. At about this same time, Plaintiff joined Teamsters for a Democratic Union ("TDU"), a reform union within Teamsters. TDU represents itself as a reform union that provides education and information to Teamster members that the national union leaders will not provide.

17. During 2013, Plaintiff became a nationally-recognized reform leader. He traveled to conventions, met with numerous members, and even had various articles written about him and his efforts to reform Teamsters.

18. Plaintiff publically backed Fred Zuckerman, President of Teamsters Local 89 in Louisville, Kentucky for General President of Teamsters in his race against Jimmy Hoffa, Jr., a notorious union leader. In fact, Plaintiff circulated a petition online to replace Hoffa that garnered over 800 signatures.

19. During Summer 2013, in preparation of the vote on the new contract with UPS, Plaintiff and other members of Teamsters Local 623 camped outside the UPS buildings in Philadelphia while they were not working. Plaintiff personally made "Vote No" signs and banners, which he and the other members displayed outside the UPS buildings in Philadelphia.

20. At this time, Teamsters Local 623 leadership told members to vote "Yes" in favor of the new contract with UPS.

21. As a result, an overwhelming 80% of the membership of Teamsters Local 623 voted "No". In fact, eighteen (18) local chapters voted down the new contract across the country, forcing the national Teamsters Union back to the negotiating table.

22. Following the first successful "No" vote on the national UPS contract, Plaintiff formed a slate of seven (7) individuals to run for leadership of the Teamsters Local 623, with Plaintiff at the top of the ticket. Plaintiff advertised the ticket as "The Integrity Slate".

23. The Teamsters Union prepared a new vote on the UPS contract, with minimal differences. In preparation of the vote, Teamsters Local 623 leadership asked Hoffa for help. Hoffa sent several International Vice Presidents to Philadelphia to support the local leadership.

24. Plaintiff and The Integrity Slate again made "Vote No" signs and banners, which he and the other members displayed outside the UPS buildings in Philadelphia. They also handed out fliers, again urging members to "Vote No" with an explanation of the rationale.

25. In October 2013, an overwhelming 80% of the membership of Teamsters Local 623 again voted "No". In fact, three (3) chapters again voted down the new contract across the country, forcing the national Teamsters Union back to the negotiating table.

26. Rather than voting a third time, Hoffa and the national Teamsters leadership changed the Constitution of the Teamsters to allow the national leadership to adopt the new contract with UPS without a third vote.

27. The Integrity Slate, with Plaintiff in the lead, handed out t-shirts, fliers, and novelties to their co-workers in advance of the local leadership election. In fact, Plaintiff even sent campaign mailers to every member of the Teamsters Local 623; in excess of 2,500 members.

28. Out of 2,500 members, The Integrity Slate lost by only 30 votes. However, Plaintiff was approached by several individuals claiming knowledge of election fraud.

29. Plaintiff accepted his loss, despite the occurrences of election fraud, and prepared to run again in the 2016 election.

30. Plaintiff experienced verbal harassment from Teamsters Local 623 leadership and friends following the election that was ongoing until his retaliatory termination.

31. In or around Spring 2014, Plaintiff signed up to be trained as a CDL Class A truck driver. However, despite his nineteen (19) years of seniority, Plaintiff was skipped over by the local leadership.

32. Plaintiff filed a grievance for being skipped over based on his seniority. As a result, Plaintiff was awarded the training and obtained his CDL Class A truck driver license. Plaintiff began working as a tractor trailer truck driver in or around July 2014.

33. On or about April 17, 2015, after working eight (8) hours jockeying trailers around the Oregon Ave - Philadelphia UPS yard, Plaintiff was told to drive a trailer (#827629) from the Philadelphia UPS yard to the UPS facility located in Hunt Valley, Maryland. On the return trip, Plaintiff was instructed to drive a trailer (#887978) to Philadelphia.

34. That evening, during the return trip, Plaintiff stopped at the "Chesapeake House" rest stop on I-95 to use the bathroom. After using the bathroom and splashing water on his face, Plaintiff exited and saw a co-worker, Sam Mendez.

35. Plaintiff decided to use his ten-minute break to re-charge and talk to Mendez. Sal Falice, another co-worker, also stopped to talk. During the conversation, Mendez provided tips on how to stay awake during the later hours of long trips.

36. After the ten-minute break, the drivers returned to their trucks. As Plaintiff started up his truck, Mendez ran over and asked for a quarter. Plaintiff tossed Mendez a quarter and drove off. Plaintiff, at no time, knew what Mendez needed the quarter for and assumed generally that he needed the quarter for monetary reasons.

37. In total, Plaintiff worked approximately thirteen and one-half (13 ½) hours on April 17, 2015. The "Chesapeake House" rest stop occurred during the last two (2) hours of his double-shift.

38. On or about April 22, 2015, while Plaintiff was working, Plaintiff was called into the office. John Fiorentino, a New Jersey chapter leader, accused Plaintiff of "stealing time" by not clocking out while Plaintiff stopped to use the bathroom on April 17, 2015.

39. No explanation was provided for why Fiorentino was involved, let alone leading, the accusations as he was not a member of the local Philadelphia union – Teamsters Local 623.

40. Fiorentino explained that they had a video of Plaintiff stopping at the "Chesapeake House" rest stop. Fiorentino further stated that Plaintiff failed to clock out for his bathroom break.

41. Fiorentino then questioned Plaintiff concerning the quarter. Plaintiff answered as best as he could remember, but explained that he had worked a thirteen and one-half (13 ½) hour day and could not remember much of the meaningless details.

42. Fiorentino terminated him at the conclusion of the questioning. (Exhibit A – Termination Letter). Plaintiff was then humiliatingly escorted by guards to the gate in front of many co-workers.

43. Upon information and belief, UPS is legally not allowed to force Plaintiff to clock out for a bathroom break while he is hauling tractors.

44. Upon information and belief, Plaintiff appropriately used his ten-minute break.

45. Plaintiff filed two grievances. Plaintiff filed Grievance #9965 for unjust termination (Exhibit B – Grievance #9965) and Grievance #9966 for constant harassment (Exhibit C – Grievance #9966). Grievance #9966 was never addressed.

46. On or about May 1, 2015, a hearing was held with regards to Grievance #9965 for unjust termination. The Hearing Panel again stated that Plaintiff had failed to clock-out for his bathroom break.

47. Plaintiff explained to the Hearing Panel that (a) the UPS IVIS and Timecard systems do not have a procedure or ability to clock out for a bathroom break; and, (b) Plaintiff was recently trained by two (2) supervisors separately and neither clocked-out during the times they stopped for a bathroom break.

48. The Hearing Panel asked Plaintiff questions about the quarter, accusing Plaintiff of equipment tampering. Plaintiff learned that Mendez had used the quarter Plaintiff had given him to tamper with Falice's truck's air lines as a prank. Plaintiff emphatically denied any knowledge

or involvement with the prank, other than innocently providing Mendez with a quarter when requested.

49. The Hearing Panel watched a video several times but refused to allow Plaintiff to see it. The Hearing Panel claimed that the video provided proof of Plaintiff's misdeeds.

50. At the end of the hearing, Plaintiff was again escorted off the premises by guards.

51. Plaintiff filed six more grievances. (Exhibit D – Additional Grievances). Through the grievances, Plaintiff requested to see the video and claimed that the termination was retaliatory.

52. As a result of the additional grievances, Plaintiff was shown the video. The video clearly shows Plaintiff take a ten-minute break, from 7:57pm to 8:07pm. It does not show any evidence of Plaintiff tampering with any equipment.

53. In or around Thursday, May 14, 2015, a letter was sent to Plaintiff advising him that a Committee would hear his grievance/appeal regarding his termination in Asheville, NC on May 19th and 20th. (Exhibit E – Hearing Notice). The letter required Plaintiff to notify the local union if he was going to attend at least five days before the hearing; i.e. the same day the letter was sent.

54. Plaintiff made arrangements and attended the hearing in North Carolina.

55. On or about May 19, 2015, Plaintiff attended the hearing. Plaintiff offered a letter from Bill Morris, a local union leader into evidence. (Exhibit F – Morris Letter).

56. Plaintiff also submitted a notarized statement from Mendez stating that Plaintiff "had nothing to do with the quarter incident." (Exhibit G – Mendez Statement).

57. Finally, Plaintiff submitted a notarized statement, that Plaintiff made, stating that he had "never been trained by any part of management on how to properly code restroom stops." (Exhibit H – Curry Statement).

58. Despite the evidence that Plaintiff knew nothing of the quarter prank and was never trained to clock out during restroom breaks, Plaintiff's termination was upheld. (Exhibit I – Termination Decision Letter) ("Termination Decision Letter").

59. Although the Termination Decision Letter was dated May 20, 2015, Plaintiff did not obtain a copy of the letter for several months and after several attempts to obtain it.

60. The Termination Decision Letter was signed by Dennie Gandee, on behalf of UPS, and Greg Yerace, on behalf of the Union. Yerace works hand-in-hand with Ken Hall, Hoffa's top lieutenant, at Teamsters Local 175. Upon information and belief, Yerace was instructed to terminate Plaintiff regardless of the evidence.

61. Additionally, Plaintiff filed a claim with the Pennsylvania Department of Labor & Industry. Plaintiff sought Unemployment Compensation. As a result of the claim, the Department found that there was "insufficient information provided to show that the Claimant committed a dishonest act" and award Plaintiff benefits under the Pennsylvania Unemployment Compensation Law. (Exhibit J – Unemployment Letter).

62. Upon information and belief, several other union members across the country, who ran on reform tickets for top leadership positions of local unions, have also been terminated for dubious reasons in retaliation.

63. Upon information and belief, Plaintiff was terminated for his involvement with The Integrity Slate and his campaign to vote down the national UPS contract in clear violation of his Constitutional and statutory rights.

64. As a result of the aforesaid, Plaintiff suffered significant financial harm and severe emotional distress.

IV.     **Causes of Action**

### COUNT I
### Wrongful Termination
*Plaintiff v. All Defendants*

65. Plaintiff incorporates the foregoing paragraphs as if fully set forth at length herein.

66. At all times relevant, Plaintiff was employed by Defendants.

67. Defendants made false claims against Plaintiff.

68. Despite the claims being false, Defendants took adverse action against Plaintiff, namely firing Plaintiff, as a punitive measure.

69. The adverse action, Defendants firing Plaintiff, is a violation of the public policy exception to at-will employment allowing for free speech outside the scope of employment.

70. As a result of Defendants' actions, Plaintiff has sustained damages, as set forth above.

### COUNT II
### First Amendment Retaliation
*Plaintiff v. All Defendants*

71. Plaintiff incorporates by reference all prior paragraphs as if fully set forth at length herein.

72. Plaintiff was terminated solely for his involvement with The Integrity Slate and his campaign to vote down the national UPS contract in clear violation of his Constitutional and statutory rights.

73. Defendants caused Plaintiff to suffer a violation of the First Amendment of the United States Constitution, actionable through 42 U.S.C. §1983, et seq., and state law.

### COUNT III
### Breach of Contract / Breach of Duty of Fair Representation
*Plaintiffs v. Teamsters & Teamsters Local 623*

74. Plaintiff incorporates by reference all prior paragraphs as if fully set forth at length herein.

75. Plaintiff was a party to a written contract for representation by the Teamsters Local 623 and/or Teamsters in any and all employment-related proceedings (believed to be in possession of Teamsters Local 623).

76. Defendants' aforementioned conduct constitutes a breach of the agreement (believed to be in possession of Teamsters Local 623), express, implied, and as a matter of law, and the covenant of good faith and fair dealing, and fair representation.

77. As a direct and proximate result of the aforesaid breach of the agreement, Plaintiff has been damaged as set forth above.

### V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment in his favor and against Defendants, individually, jointly and/or severally, in an amount in excess of $75,000.00, including:

a. Compensatory, statutory, treble and punitive damages;

b. Reasonable attorneys' fees, costs and interest; and

c. Such other and further relief as this Court may deem proper, including injunctive relief.

WEISBERG LAW

Matthew B. Weisberg, Esq.
L. Anthony DiJiacomo, III, Esq.
*Attorneys for Plaintiff*